# — EXHIBIT  1 —

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Rules and Regulations Implementing the | **)** | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | **)** | |

**REPORT AND ORDER AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted:  February 15, 2024**                                    **Released:  February 16, 2024**

**Comment Date:  [30 days after publication in the Federal Register]**
**Reply Date:  [45 days after publication in the Federal Register]**

By the Commission: Chairwoman Rosenworcel and Commissioner Gomez issuing separate statements.

## I.    INTRODUCTION

1.    The Telephone Consumer Protection Act (TCPA) restricts robocalls and robotexts, absent the prior express consent of the called party or a recognized exemption.[1]  A consumer's right to revoke consent after deciding they no longer want robocalls or robotexts is essential to the right of consent.  Over many years, the Commission has addressed consent and revocation.  Here we take steps both to establish new consent protections and to make explicit those protections the Commission failed to codify in the past.  More specifically, we strengthen consumers' ability to revoke consent so that it is simple and easy, codify previously adopted protections that make it simpler for consumers to revoke consent, and require that callers and texters implement requests in a timely manner.[2]  We also seek comment on whether the TCPA applies to robocalls and robotexts from wireless providers to their own subscribers and seek comment on the ability to revoke consent and thereby stop these communications.

## II.    BACKGROUND

2.    The TCPA prohibits initiating "any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party" unless a statutory exception applies or the call is "exempted by rule or order by the Commission under [section 227(b)(2)(B)]."[3]  The TCPA also prohibits, without the prior express consent of the called

---

[1] Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991), *codified at* 47 U.S.C. § 227.  The TCPA does not define prior express consent or otherwise provide guidance relating to how consumers may provide or revoke consent to receive robocalls.  The TCPA excepts from this prohibition calls made for emergency purposes.  The Commission has also exercised its statutory authority to adopt certain exemptions from this prohibition.  *See* 47 CFR § 64.1200(a)(3), (9).

[2] As discussed in more detail below, the TCPA regulates any call made using an "automatic telephone dialing system" or an artificial or prerecorded voice.  The Commission has confirmed that a text message sent using an autodialer is a "call" subject to the TCPA.  Any such call is considered a "robocall" or "robotext" for purposes of this proceeding.  *See* 47 U.S.C. § 227(b)(1).  *See also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) (noting that text messaging is a form of communication used primarily between telephones and is therefore consistent with the definition of a "call").

[3] 47 U.S.C. § 227(b)(1)(B).  In the case of robocalls that introduce an advertisement or contain telemarketing, the Commission's rules require that the caller obtain the prior express *written* consent of the called party.  *See* 47 CFR § 64.1200(a)(2), (3).

party, any non-emergency call made using an automatic telephone dialing system or an artificial or prerecorded voice to any telephone number "assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call" unless a statutory exception applies.[4]

3.      *Consent to Calls from Wireless Carriers.*  In 1992, the Commission concluded that wireless carriers need not obtain "additional consent" from their own subscribers prior to initiating autodialed or artificial or prerecorded voice calls to those subscribers.[5]  In 2019, two petitioners sought a ruling that wireless subscribers can stop robocalls and robotexts from their wireless service provider by making a request to their service provider to halt these communications.[6]

4.      *Opt-out Confirmation Texts.*  In 2012, the Commission ruled that sending a one-time text message confirming a consumer's request that no further text messages be sent from that sender does not violate the TCPA if the confirmation text complies with certain limitations, including that it not contain any marketing.[7]  In 2019, Capital One filed a petition requesting a declaratory ruling that, if a consumer who has consented to receive multiple types of informational messages from a sender then revokes consent, the sender should be able to clarify the scope of the revocation in a one-time message without violating the TCPA.[8]  Capital One notes that it sends customers a variety of different categories of informational text messages, including fraud alerts, payment responses, low balance alerts, and overseas transaction alerts.[9]

5.      *Revocation of Consent.*  In 2015, the Commission clarified that consumers who have provided prior express consent to receive autodialed or prerecorded calls may revoke such consent through any reasonable means.[10]  Citing prior Commission rulings and the "well-established common law right to revoke prior consent," the Commission concluded that the most reasonable interpretation of "prior

---

[4] *See* 47 U.S.C. § 227(b)(1)(A)(iii).

[5] *See Rules and Regulations Implementing the Telephone Consumer Protect Act of 1991*, CC Docket No. 92-90, Report and Order, 7 FCC Rcd 8752, 8774, para. 45 (1992) (*1992 TCPA Order*).

[6] *See Lucas Cranor Petition for Declaratory Ruling Requesting Order Granting That Consumers have the Right to Revoke Consent Under the Telephone Consumer Protection Act*, CG Docket No. 02-278 (filed Dec. 17, 2019) (arguing that "consumers have the right to revoke consent from receiving unwanted marketing text messages from their wireless providers at any time by any reasonable means; and that wireless providers must honor these revocation requests immediately") (*Cranor Petition*); *Petition of Paul Armbruster for Declaratory Ruling Or Alternatively A Rulemaking Regarding A Consumer's Absolute Right to Revoke Consent to Receive Unwanted Text Messages From Common Carriers*, CG Docket No. 02-278 (filed July 9, 2019) (requesting confirmation that a cellular phone customer can revoke consent to receive any and all unwanted text messages from their cell service provider) (*Armbruster Petition*).

[7] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, *Soundbite Communications, Inc.*, CG Docket No. 02-278, Declaratory Ruling, 27 FCC Rcd 15391, 15394, para. 7 (2012) (*Soundbite Declaratory Ruling* or *Soundbite*).

[8] *See Capital One Services, LLC, Petition for Declaratory Ruling,* CG Docket Nos. 18-152 and 02-278 (filed Nov. 1, 2019) (arguing that, "if the sender of a lawful informational text message transmitted through an automatic telephone dialing system ('ATDS') receives a valid opt-out request from the recipient in response to that message, and that informational message was part of a program in which the recipient had previously enrolled that transmits several categories of informational messages, then, pursuant to the Commission's ruling in *Soundbite*, the sender may clarify in an opt-out confirmation message to the recipient the scope of the recipient's opt-out request without violating the [TCPA] or related Commission rules") (*Capital One Petition*).

[9] *Id.* at 4.

[10] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, WC Docket No. 07-135, Declaratory Ruling and Order, 30 FCC Rcd 7961, 7993-99, paras. 55-70 (2015) (*2015 TCPA Declaratory Ruling*).

express consent" in light of the TCPA's consumer protection goals is "to permit a right of revocation."[11] In so doing, the Commission indicated that "to allow callers to designate the exclusive means of revocation would, at least in some circumstances, materially impair that right."[12]  As a result, the Commission concluded that a consumer "may revoke his or her consent in any reasonable manner that clearly expresses his or her desire not to receive further calls, and that the consumer is not limited to using only a revocation method that the caller has established as one that it will accept."[13]

6.        In 2016, Mobile Media Technologies (Mobile Media) filed a petition asking the Commission to clarify that the TCPA does not require a party transmitting a text message to create or make available to consumers a specific or particular method (such as bilateral text messaging, in which the consumer may revoke consent by replying "STOP") by which a consumer may revoke prior express consent to be texted.[14]

7.        *TCPA Consent NPRM*.  On June 9, 2023, the Commission released a Notice of Proposed Rulemaking[15] that proposed to amend our rules to: 1) strengthen the right of revocation by specifying reasonable methods to revoke while codifying the underlying right to revoke by any reasonable means;[16] 2) require that, within 24 hours of receipt, callers must honor company-specific do-not-call and revocation of consent requests for robocalls and robotexts that are subject to the TCPA; 3) codify the Commission's *Soundbite Declaratory Ruling* clarifying that a one-time text message confirming a consumer's request that no further text messages be sent does not violate the TCPA or the Commission's rules as long as the confirmation text merely confirms the called party's opt-out request and does not include any marketing or promotional information, and the text is the only additional message sent to the called party after receipt of the opt-out request;[17] and, 4) require wireless providers to honor their customers' requests to cease autodialed, prerecorded voice, and artificial voice calls, and autodialed texts.[18]

8.        In general, commenters support the goal of providing consumers with the ability to revoke consent to robocalls and robotexts that they do not wish to receive in a timely manner by codifying

---

[11] *Id.* at 7994, 7997, paras. 57-58, 66 (citing *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005; Application for Review filed by Anda, Inc.; Petitions for Declaratory Ruling, Waiver, and/or Rulemaking Regarding the Commission's Opt-Out Requirement for Faxes Sent with the Recipient's Prior Express Permission*, CG Docket No. 02-278, 05-338, Order, 29 FCC Rcd 13998 (2014) (*Anda Order*); Restatement (Second) of Torts § 892A, cmt. i. (1979) ("consent is terminated when the actor knows or has reason to know that the other is no longer willing for him to continue the particular conduct")).

[12] *2015 TCPA Declaratory Ruling*, 30 FCC Rcd at 7997, para. 66.

[13] *Id.* at 7998-99, para. 70.

[14] *See Petition of Mobile Media Technologies for Declaratory Ruling or, In the Alternative Retroactive Waiver,* CG Docket No. 02-278, WC Docket No. 07-135 (filed April 5, 2016) (*Mobile Media Petition*).

[15] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Notice of Proposed Rulemaking, FCC 23-49 (2023) (*TCPA Consent NPRM*).

[16] *Id.* at paras. 9-12.  The Commission proposed to clarify that reasonable methods to revoke consent typically include revocation requests made by text message, voicemail, or email to any telephone number or email address at which the consumer can reasonably expect to reach the caller.  As a result, when a consumer uses any such method to revoke consent, the Commission proposed that doing so creates a presumption that the consumer has revoked consent, absent evidence to the contrary.

[17] *Id*. at paras. 16-20.  In addition, the Commission proposed to codify that senders can include a request for clarification in the one-time confirmation text, provided the sender ceases all further robocalls and robotexts absent an affirmative response from the consumer that they wish to receive further communications from the sender.

[18] *Id*. at paras. 21-26.  To effectuate this change, the Commission proposed to alter our prior ruling to require wireless providers to subject such calls to certain conditions pursuant to an exemption that protects the privacy interests of subscribers.

those obligations into the Commission's rules.[19]  Several commenters, however, take issue with the specific proposals set forth in the NPRM as discussed below.

## III.    DISCUSSION

9.    In this Order, we clarify and strengthen consumers' rights under the TCPA to grant and revoke consent to receive robocalls and robotexts.  Specifically, we adopt rules to: 1) make clearer that revocation of consent can be made in any reasonable manner; 2) require that callers honor do-not-call and consent revocation requests within a reasonable time not to exceed 10 business days of receipt; 3) limit text senders to a one-time text message confirming a consumer's request that no further text messages be sent, as well as confirming that any revocation of consent applies only to those robocalls and robotexts for which consent is required under the TCPA.

### A.    Revoking Consent in Any Reasonable Way

10.    We strengthen consumers' right to revoke consent by any reasonable means by codifying the right and ensuring callers and texters do not unduly restrict it.[20]  We believe this will make clearer to callers and consumers that a consumer has a right to revoke consent under the TCPA.  Specifically, we codify a new rule that will make clear that consumers may revoke prior express consent for autodialed or prerecorded or artificial voice calls and autodialed texts in any reasonable manner that clearly expresses a desire not to receive further calls or text messages, and that callers may not infringe on that right by designating an exclusive means to revoke consent that precludes the use of any other reasonable method.

11.    We agree with commenters who contend that further clarification as to the methods that are "reasonable" to revoke consent promotes the interests of both consumers and callers by ensuring that such requests are honored.[21]  These commenters contend that ambiguous or overly broad interpretations of "reasonable methods" to revoke consent subject them to compliance burdens and potential liability.[22] We agree that further clarification is warranted to aid callers in complying with the obligation to process revocation requests made by consumers using any reasonable means.  Specifically, we adopt a new rule that makes clear that any revocation request made using an automated, interactive voice or key press-activated opt-out mechanism on a robocall; via a response of "stop" or a similar, standard response message sent in reply to an incoming text message;[23] or submitted at a website or telephone number provided by the caller to process opt-out requests constitute examples of a reasonable means to revoke consent.  If a called party uses any such method designated by the caller to revoke consent, we consider that consent to be definitively revoked by a reasonable means, and future robocalls and robotexts from that caller must be stopped.  When the caller offers such a means to revoke consent, that caller cannot allege that the use of such a mechanism by the called party is unreasonable.  Any such request made by these specific means constitutes absolute proof that the called party has used a reasonable means to revoke consent.

12.    We agree that the Commission should adopt a standardized list of the specific words that may be used to revoke consent via a reply text message to ensure that automated systems can process such requests.[24]  Specifically, we find that using the words "stop," "quit," "end," "revoke," "opt out,"

---

[19] *See, e.g.*, Capital One Comments at 2; Cargo Comments at 7; NCLC et al. Comments at 1; PACE Comments at 3.

[20] *See 2015 TCPA Declaratory Ruling*, 30 FCC Rcd at 7993-99, paras. 55-70 (noting that, "because the TCPA does not speak directly to the issue of revocation, the Commission can provide a reasonable construction of its terms").

[21] *See, e.g.*, ABA Comments at 6; EEI Comments at 12 (requesting that the Commission further clarify what methods of revoking consent are reasonable); NTCA Comments at 1 (encouraging additional guidance); PACE Comments at 4-6.

[22] *See, e.g.*, GECU Comments at 1-2; UHG Comments 4; Vibes Comments at 5-6.

[23]  *See infra* para. 12.

[24] *See, e.g.*, ABA Comments at 13; EEI Comments at 12; MEF Comments at 3; PACE Comments at 4; Vibes Comments at 6; ACA Reply Comments at 3.

"cancel," or "unsubscribe" via reply text message constitutes a *per se* reasonable means to revoke consent.[25]  For purposes of revoking consent via a reply text message, the record confirms that both consumers and the industry commonly use these specific words to convey a reasonable and unambiguous intent to revoke consent.[26]  In addition, the record suggests that callers can use automated means to process these words in order to honor revocation of consent requests.[27]

13.     This does not preclude, however, the use of other words and phrases to revoke consent. If the reply text contains words or phrases other than those listed above, and should any dispute on this point arise, the text sender, who is responsible for processing the revocation request, will have an opportunity to explain why the consumer's use of alternative words or phrases does not constitute a reasonable means to revoke consent.  In these situations, the Commission or the court as the finder of fact will conduct a totality-of-circumstances analysis to determine whether the request to revoke consent has been conveyed in a reasonable manner.  Consistent with the *2015 TCPA Order*, when assessing whether any particular means of revocation used by a consumer is reasonable, the finder of fact will look to the totality of the facts and circumstances surrounding the specific situation, including, for example, whether the consumer had a reasonable expectation that they could effectively communicate their request for revocation to the caller in that circumstance, and whether the caller can implement the mechanisms to effectuate a requested revocation without incurring undue burdens.[28]  We believe this approach balances the ability of consumers to easily stop unwanted text messages with the ability of text senders to reasonably process such requests.

14.      Although we confirm that there is no mandate that texting parties transmitting an autodialed text message must provide consumers with any specific means to revoke consent, such as through the use of reply text messages, we caution that this is a reasonable and widely recognized means for text recipients to revoke prior consent to text messages.[29]  There may be instances, however, where a text initiator chooses to use a texting protocol that does not allow reply texts.[30]  We adopt a rule that, in those instances, requires the text initiator to: (1) provide a clear and conspicuous disclosure in each text to the consumer that two-way texting is not available due to technical limitations of the texting protocol; and (2) clearly and conspicuously provide reasonable alternative ways for a consumer to revoke consent, such as a telephone number, website link, or instructions to text a different number to revoke consent from further unwanted text messages.[31]  We recognize that character limits on text messages necessitate that such disclosures will need to be succinct to avoid unduly infringing on the sender's ability to communicate using a text message.

---

[25] Where a texter sends a consumer messages in a language other than English at the consumer's request and the consumer attempts revocation in that language using its equivalent of these words, the finder of fact may conclude the revocation attempt is reasonable under a totality of the circumstances analysis.

[26] The record confirms that these specific words are industry standards that are recognized by automated systems to process opt-out requests made via a reply text message.  *See, e.g.* ABA Comments at 13; EEI Comments at 12; MEF Comments at 3; PACE Comments at 4; Vibes Comments at 6; ZipDX Comments 3.

[27] *See, e.g.*, ABA Comments at 13; EEI Comments at 12.

[28] *See 2015 TCPA Order*, 30 FCC Rcd at 7996, n.233.

[29] *See, e.g.*, CTIA, Messaging Principles and Best Practices 5.1.3 (May 2023), available at https://api.ctia.org/wpcontent/uploads/2023/05/230523-CTIA-Messaging-Principles-and-Best-Practices-FINAL.pdf.

[30] *See, e.g.*, *Mobile Media Petition*.

[31] The issues raised in the *Mobile Media Petition* are therefore addressed herein by confirming that the TCPA does not require a party transmitting a text message to create or make available to consumers a specific or particular method (such as bilateral text messaging) by which a consumer may revoke prior express consent.  In addition, we further codify the sender's obligations when the text initiator chooses not to use a text protocol that allows for reply texts.  As a result, we dismiss this petition as moot because we have essentially resolved any uncertainty or controversies raised in that petition pursuant to the rules adopted herein.

15.    We disagree with commenters who argue that callers should be allowed to designate the specific means to permit consumers to revoke consent and that revocation requests must be directed only to those designated methods.[32]  We therefore codify a prohibition to that end.  In the *2015 TCPA Declaratory Ruling,* the Commission rejected an identical request, concluding that a "consumer may revoke his or her consent in any reasonable manner that clearly expresses his or her desire not to receive further calls, and that the consumer is not limited to using only a revocation method that the caller has established as one that it will accept."[33]  Allowing callers to limit revocation requests only to the specific means that they have designated potentially places a significant obstacle in the way of consumers who no longer wish to receive such calls by limiting the methods available to revoke consent, which is inconsistent with the consumer privacy protections afforded under the TCPA.[34]  In addition, the clarifications set forth herein ensure that consumers have the ability to easily exercise their right to revoke consent while providing callers with a reasonable opportunity to process such requests made in any reasonable way.  For example, as discussed below, when the consumer chooses to use a method that has not been designated by the caller to process revocation requests, the caller will have an opportunity to prove why the method used is not reasonable.

16.    We also codify that, when a consumer uses a method other than those discussed above to revoke consent, such as those made by voicemail or email to any telephone number or address at which the consumer can reasonably expect to reach the caller but which has not been designated by the caller as a method to revoke consent, doing so creates a rebuttable presumption that the consumer has revoked consent when the called party satisfies their obligation to produce evidence that such a request has been made, absent evidence to the contrary.  We stress that, in the event of a dispute, the consumer must identify to the finder of fact the specific method and/or message used to convey their revocation of consent in order to avail themselves of this rebuttable presumption.  As discussed above, in these instances when a consumer has demonstrated that they have made a revocation request, and the caller disputes that the revocation request has been made using a reasonable method, a totality of circumstances analysis will determine whether the caller can demonstrate that a request to revoke consent has not been conveyed in a reasonable manner.[35]  We disagree with commenters who argue this approach is inconsistent with consumers' right to revoke by any reasonable means.[36]  Our approach is a means to ascertain whether a consumer has used a reasonable method to revoke consent when the consumer has used a method of their own choosing rather than one established by the calling or texting entity.

17.    Lastly, we note that section 64.1200(c)(2) requires that callers not make "telephone solicitations" to telephone numbers registered on the National Do-Not-Call Registry unless the caller has

---

[32] *See, e.g.* NTCA Comments at 2-3; SFCU Comments at 1; REACH Reply Comments at 4-5.

[33] *See 2015 TCPA Declaratory Ruling*, 30 FCC Rcd at 7996-99, paras. 64-70.  Some parties argue that consumers and callers should be free to negotiate their own terms for revocation.  *See, e.g.*, ABA Comments at 10; ACA Comments at 14.  These parties do not, however, provide analysis about the intersection of the TCPA and contract law.  Moreover, courts are well-equipped to apply the relevant body of contract law that may arise in TCPA litigation.

[34] *Id.* at 7997, para. 67.  For example, if a caller receives a consumer's valid oral consent for certain messages but requires the consumer to fax his or her revocation to the caller, perhaps with additional conditions as to the content of such a revocation, such conditions materially diminish the consumer's ability to revoke by imposing additional burdens—especially if disclosure of such conditions is not clear and conspicuous, and not repeated to the consumer with each message.

[35] *See, e.g.*, ABA Comments at 13 (arguing that the use of "non-standard text" message such as "I do not want to receive any more texts" is not a reasonable means to revoke consent because it cannot be read by automated processes).  We believe this addresses the concerns expressed by commenters that certain methods to request revocation of consent are unreasonable.

[36] *See* NCLC et al. Reply Comments at 5-8.

obtained the "prior express invitation or permission" of the called party, in writing.[37]  At the request of one commenter, we take this opportunity to clarify and amend our rules to make clear that consumers who have given their "prior express invitation or permission" to individual sellers to call their telephone numbers on the National Do-Not-Call registry have the right to revoke consent by any reasonable means.[38]  We agree that the Commission's precedent confirming the right of consumers to revoke consent to robocalls applies equally to this situation.

18.    Our rules are consistent with the Commission's prior finding that placing significant burdens on the called party who no longer wishes to receive such calls or texts is inconsistent with the TCPA and with our finding that the TCPA requires "only that the called party clearly express his or her desire not to receive further calls" to invoke this right to revoke consent.[39]

**B.    Timeframe for Honoring a Do-Not-Call or Revocation Request**

19.    As proposed in the *TCPA Consent NPRM*, we require that callers honor company-specific do-not-call and revocation-of-consent requests for robocalls and robotexts that are subject to the TCPA within a specific timeframe.  Specifically, we amend our rules to require that callers honor company-specific do-not-call and revocation-of-consent requests within a reasonable time from the date that the request is made, not to exceed 10 business days after receipt of the request.[40]

20.    Consumers are understandably frustrated when they receive robocalls and robotext messages days or even weeks following a request to stop such communications.  Such delays also undermine a consumer's right to determine which robocalls and robotexts they wish to receive under the privacy protections afforded by the TCPA.  In addition, advances in technology over the years, including automated and interactive technologies, have made the processing of do-not-call and consent-revocation requests more efficient and timely than in the past.[41]  As discussed in more detail below, we believe that such technological advances provide callers and senders of text messages with the tools they need to process all do-not-call and consent-revocation requests quickly, and certainly within 10 business days.  We will monitor compliance with this obligation to ensure that such requests are honored in a timely manner and reserve the right to adjust this timeframe as necessary in the future as technologies continue to advance, and thereby further reduce the time necessary to process such requests after notice and comment.

21.    We revise our proposed 24-hour timeframe in response to commenter concerns that the proposed 24-hour timeframe would not be feasible in many instances.[42]  We are persuaded by the record, including comments from consumer organizations, that a longer timeframe is justified to ensure that entities, including smaller entities, have a reasonable opportunity to process do-not-call and revocation requests.[43]  The timeframe we adopt is supported by several commenters and is consistent with the timeframe that has been in place for decades to process revocation requests concerning commercial e-mail

---

[37] *See* 47 CFR § 64.1200(c)(2)(ii).

[38] *See* NCLC et al. Comments at 15.

[39] *See 2015 TCPA Declaratory Ruling*, 30 FCC Rcd at 7997, para. 67.

[40] We encourage callers to honor such requests as soon as practicable as a best practice.

[41] *See, e.g.*, Shields Comments at 1; PACE Comments at 7; Williams Comments at 1; ZipDX Comments at 5.

[42] *See, e.g.*, ABA Comments at 16 (requesting six business days to process revocation requests); ACA Comments at 16 (10 business days); EEI Comments at 15 (10 business days): NAMIC Comments at 3 (not to exceed 14 business days); NTCA et al. Comments at 5 (72 hours); PACE Comments at 7 (five business days): UHG Comments at 3 (14 days).

[43] *See, e.g.*, ACA Comments at 16 (noting that the CAN-SPAM rules allow 10 business days to honor revocation requests); NCLC et al. Reply Comments at 4 (recommending that the Commission allow a longer period for the first year after the regulation goes into effect—perhaps as long as 14 days, but then require that callers figure out how to adopt an implementation period of two business days after the revocation request is made).

under our CAN-SPAM rules.[44]  We believe this outcome adequately balances the burdens on callers with the privacy protections afforded to consumers, with a "no longer than 10 business days" backstop to ensure that consumers have certainty about when they can expect unwanted communications to stop.

22.    The Commission's rules currently provide no specific timeframe for honoring revocation-of-consent requests for robocalls and robotexts made to residential or wireless telephone numbers.  The Commission's rules currently require callers making telemarketing calls or exempted artificial and prerecorded voice calls to residential telephone numbers and exempted package delivery calls and texts to wireless consumers to honor do-not-call requests within a reasonable time not to exceed 30 days from the date of any such request.[45]  As a result, the timeframe adopted herein substantially reduces the maximum period allowed for honoring the revocation requests of consumers while allowing callers a reasonable opportunity to ensure that they can process requests made by any reasonable means.  We emphasize that the availability of automated means to process revocation requests means that honoring such requests should be swift, especially as technology improves to make automation more simple and economical.  We will continue to monitor these advances to ensure that consumers receive the full benefits of these technologies.

23.    As proposed in the *TCPA Consent NPRM*, we also amend our rules for exempted package delivery calls to substantially reduce the 30-day timeframe to process such requests allowed in our current rules.[46]  Specifically, we amend the exemption that allows package delivery notification robocalls and robotexts without consent to require that opt-out requests be honored within a reasonable time not to exceed six business days.[47]  The record suggests that this timeframe is sufficient to ensure processing of revocation requests in this specific context.[48]  No commenter argues for any other timeframe in this context or objects to this timeframe.  As a result, we believe this will provide consumers with certainty that their requests are honored in a more timely manner while allowing package delivery companies a reasonable opportunity to process such requests.

### C.    Revocation Confirmation Text Message

#### 1.    Confirmation of Revocation Request

24.    As proposed in the *TCPA Consent NPRM*, we codify the Commission's *Soundbite Declaratory Ruling* which clarified that a one-time text message confirming a consumer's request that no further text messages be sent does not violate the TCPA or the Commission's rules as long as the confirmation text merely confirms the called party's opt-out request and does not include any marketing or promotional information, and the text is the only additional message sent to the called party after receipt of the opt-out request.[49]  Consistent with the *Soundbite Declaratory Ruling*, if the confirmation text is sent within five minutes of receipt, it will be presumed to fall within the consumer's prior express

---

[44] *See, e.g.*, ACA Comments at 16; EEI Comments at 15; REACH Reply Comments at 1; *see also* 47 CFR 64.3100(b)(1).  In some instances, commenters suggested that revocation requests could be honored in even a shorter timeframe.  *See* ABA Comments (six business days); NTCA Comments at 5 (three days); PACE Comments at 7 (five days).

[45] *See* 47 CFR § 64.1200(a)(9)(i), (d)(3).

[46] *See* 47 CFR § 64.1200(a)(9)(i)(F).

[47] *See* 47 CFR § 64.1200(a)(9)(i).

[48] *See, e.g.*, Cargo Comments at 6 (noting that many package delivery companies must coordinate their deliveries with vendors and suggesting that a six-business-day timeframe allows for a reasonable amount of time).

[49] *See Soundbite Declaratory Ruling*, 27 FCC Rcd at 15394-98, paras. 7-12 (noting that the sending of such confirmation text messages is a widespread practice that often benefits consumers).

consent.[50]  If it takes longer, however, the sender will have to make a showing that such delay was reasonable, and the longer this delay, the more difficult it will be to demonstrate that such a message falls within the original prior consent.[51]  In the *Soundbite Declaratory Ruling*, the Commission determined that "confirmation messages ultimately benefit and protect consumers by helping to ensure, via such confirmation, that the consumer who ostensibly opted out in fact no longer wishes to receive text messages from entities from whom the consumer previously expressed an affirmative desire to receive such messages."[52]  We agree with numerous commenters that codifying this ruling will better ensure that both text senders and recipients are aware of this ruling, including the limitations on such one-time confirmation text messages.[53]

25.      We also adopt our proposal to codify that senders can include a request for clarification in this one-time confirmation text, provided the sender ceases all further robocalls and robotexts absent an affirmative response from the consumer.[54]  We limit this opportunity to request clarification to instances where the text recipient has consented to several categories of text messages from the text sender.  Thus, this rule will give consumers an opportunity to specify which types of text messages they wish to no longer get, when the texter sends different types of messages.  That request for clarification can seek confirmation that the consumer wishes to opt out of all categories of messages from the sender, provided the sender ceases all further robocalls and robotexts absent an affirmative response from the consumer that they do, in fact, wish to receive further communications from the sender.  The lack of any response to the confirmation text must be treated by the sender as a revocation of consent for all robocalls and robotexts from the sender.[55]

26.      We adopt this proposal in response to Capital One's petition seeking confirmation that the text sender may request clarification in its one-time confirmation message of the scope of the recipient's revocation request when that recipient has consented to receiving multiple categories of informational messages from the sender.[56]  Banks and financial institutions support this request, indicating that consumers often consent to receive multiple categories of informational messages, such as

---

[50] *Id.* at 15397 at para. 11 (noting that the record in that proceeding reflects that such confirmation text messages can be sent within minutes of receipt of an opt-out request).  As discussed above, we amend our rules to require that company-specific do-not-call and revocation-of-consent requests must be honored within a reasonable time and no more than 10 business days *after receipt* of the request.  This timeframe begins upon receipt of the revocation request and not the sending of the confirmation text message.  Thus, any delay in sending the confirmation text would not result in any additional time to honor revocation requests.

[51] We note that when compliance with a specific legal requirement prohibits the sending of a confirmation text message within five minutes that this constitutes a sufficient showing that any such delay is reasonable.  Any such delay should not extend beyond the scope of the underlying prohibition on sending the text message.  *See, e.g.*, Letter from Leah Dempsey et al., Counsel for ACA International to Marlene Dortch, Secretary, FCC, dated Feb. 7, 2024 at 8 (contending that statutes such as the Fair Debt Collection Practices Act restrict the ability of debt collectors to send messages during certain hours of the day) (ACA et al. *ex parte*).

[52] *Soundbite Declaratory Ruling*, 27 FCC Rcd at 15396, para. 10.

[53] *See, e.g.*, Ad Hoc Comments at 3; EEI Comments at 16; Illinois Credit Comments at 2; NCLC et al. Comments at 3; PACE Comments at 8; ZipDx Comments at 5.

[54] The issues raised in the *Capital One Petition* are therefore addressed herein by codifying that, if a consumer who has consented to receive multiple types of informational messages from a sender then revokes consent, the sender can inform the consumer of the scope of the revocation in a one-time message without violating the TCPA.  As a result, we dismiss this petition as moot because we have essentially resolved any uncertainty or controversies raised in that petition pursuant to the rules adopted herein.

[55] We emphasize that our amended rules require that callers honor company-specific do-not-call and revocation-of-consent requests within a reasonable time and no more than 10 business days *after receipt* of the request.  The timing of the confirmation text does not impact the obligation to honor the revocation within this timeframe.

[56] *See Capital One Petition* at 7.

fraud alerts, payment notices, and declined card transactions.[57]  In these situations, opt-out requests can be ambiguous as to whether the request applies to all or just certain types of those messages.[58]  Consumer groups have also expressed support for Capital One's request, provided that a lack of any response to the confirmation text message must be interpreted by the sender to mean that the consumer's revocation request was intended to encompass all categories of robocalls and robotexts and the sender must therefore cease all further robocalls and robotexts to that consumer absent further clarification from the consumer.[59]

27.    Consistent with the *Soundbite Declaratory Ruling* and Capital One's request, we codify that any such clarification message must not contain any marketing or advertising content or seek to persuade the recipient to reconsider their opt-out decision.[60]  Rather, this clarification is strictly limited to informing the recipient of the broad scope of the opt-out request absent some further confirmation from the consumer that they wish to continue receiving certain categories of text messages from the sender.

28.    We emphasize that this confirmation text message is limited to a final *one-time* text message.  In the absence of an affirmative response from the consumer that they wish to continue to receive certain categories of informational calls or text messages from the sender, no further robocalls or robotexts for which consent is required can be made to this consumer.[61]  In addition, a "STOP" or similar text sent in response to the one-time request for confirmation does not then allow the text sender to send another request for further clarification.  As noted above, both industry and consumer groups support this proposal.[62]

### 2.    Scope of Consent Revocation

29.    We clarify that any revocation of consent request applies only to those robocalls and robotexts for which consent is required under the TCPA.  Once that consent is revoked, the caller may no longer make robocalls or send robotexts to a called party absent an exemption to the consent obligation.  However, the Commission has granted exemptions from the consent requirement for certain categories of robocalls and robotexts.[63]  In these situations, consent is not required for the caller to make or send certain exempted informational robocalls or robotexts.  Instead, the caller is required to comply with specific conditions including number and frequency limits of such communications; the caller must also stop such communications only if the consumer makes a request to opt out of the exempted communications.

30.    As a result, the rule that we codify here that requires callers to honor a revocation of consent request made by any reasonable means applies only to robocalls and robotexts that the called party has consented to receive and is separate from the ability of callers to make such informational communications pursuant to an exemption, which do not require consent.  Therefore, in effect, when a consumer revokes consent with regard to *telemarketing* robocalls or robotexts, the caller can continue to reach the consumer pursuant to an exempted informational call, which does not require consent, unless and until the consumer separately expresses an intent to opt out of these exempted calls.  Where the consumer has revoked consent in response to a telemarketing call or message, it remains unclear whether

---

[57] For example, Capital One notes that, if it were to send a text message about a declined card transaction to which the recipient responded with "stop," it would be unclear whether the customer is requesting to opt out of all messages including payment due notices and suspected fraud alerts, or only card decline notices.  *See Capital One Petition* at 3.

[58] *See, e.g.*, ACA Comments at 1-2; National Association of Federally-Insured Credit Unions at 1-2.

[59] *See* Consumer Reports Comments at 2; NCLC et al. Comments at 2.

[60] *Soundbite Declaratory Ruling*, 27 FCC Rcd at 15397, paras. 11-12; *Capital One Petition* at 2.

[61] Such consent does not necessarily have to be obtained in response to the confirmation text but can be obtained through other means that satisfy the obligations of the TCPA and Commission rules.

[62] *See, e.g.*, Ad Hoc Comments at 4; EEI Comments at 17; Illinois Credit Comments at 2; Capital One Reply Comments at 1-2.

[63] *See* 47 CFR § 64.1200(a)(3), (a)(9).

the consumer has expressed an intent to opt out of otherwise exempted informational calls absent some indication to the contrary.[64]  We agree with financial institutions' concerns that consumers may inadvertently opt out of exempted informational calls or messages such as fraud alerts when attempting to stop unwanted telemarketing calls from their bank.[65]  If the revocation request is made directly in response to an exempted informational call or text, however, this constitutes an opt-out request from the consumer and *all* further non-emergency robocalls and robotexts must stop.  In these circumstances, there is no ambiguity that the consumer's intent is to no longer receive such exempted informational calls from the caller:  the opt-out request is a communication from the consumer regarding the exempted informational calls and acts as a revocation of consent for all calls from the caller.

31.     We disagree with commenters that argue the Commission should carve out specific subcategories of informational messages such as fraud alerts, identity theft, and breach notifications and force consumers to revoke consent to these specific categories of informational messages even when the caller chooses not to comply with the conditions of an underlying exemption for such informational messages.[66]  We believe this would be burdensome to consumers and unnecessary given the ability of callers to comply with the conditions of an exemption to make such communications in the absence of having consent and the ability to send a confirmation text informing consumers of the scope of their revocation request affording them an opportunity to provide consent for any type of calls or messages that they wish to continue receiving from the caller.

32.     Lastly, we take this opportunity to confirm that, when consent is revoked in any reasonable manner, that revocation extends to both robocalls and robotexts regardless of the medium used to communicate the revocation of consent.[67]  For example, if the consumer revokes consent using a reply text message, then consent is deemed revoked not only to further robotexts but also robocalls from that caller.  The TCPA requires that the caller obtain the prior express consent of the "called party."[68]  The Commission has long held that the restriction encompasses both voice calls and texts.[69]  Consent is granted from a consumer to a calling party to be contacted at a particular wireless phone number or residential line.[70]  Revocation of consent, therefore, is an instruction that the caller no longer contact the consumer at that number.  As a result, consent is specific to the called party and not the method of communication used to revoke consent.  Thus, if a called party has revoked consent via any reasonable means, the caller no longer has consent to make further robocalls or robotexts to that called party absent instructions to the contrary from the consumer.

**D.     Legal Authority**

33.     We conclude that our legal authority for the rules adopted herein derives from section 227 of the Communications Act of 1934, as amended (the Act).[71]  As discussed above, as the expert

---

[64] For example, if the consumer makes clear in their response to a telemarketing call that they also do not wish to receive any informational calls from the caller.

[65] *See, e.g.*, Letter from Michael H. Pryor, Counsel to ACA et al. to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278 (filed Sept. 18, 2023) at 2 (arguing that "it is critical that businesses not be compelled to apply a customer's revocation request to a broader category of messages than the customer intends").

[66] *See* ACA et al. *ex parte* at 6-7.

[67] *See* EEI Reply Comments at 7-8 (contending that, if a consumer revokes consent using a reply text, the revocation should only apply to text messages).

[68] *See* 47 U.S.C. § 227(b)(1)(A).

[69] *See, e.g., Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014, 14115, para. 165 (2003).

[70] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 27 FCC Rcd at 1838, para. 20.

[71] *See* 47 U.S.C. § 227.

agency on the TCPA, the Commission has addressed issues relating to prior express consent by robocall consumers on numerous occasions.[72]

### E.    Effective Date and Compliance Date

34.    This Order will become effective 30 days after publication in the Federal Register, except that the amendments to sections 64.1200(a)(9)(i)(F) and 64.1200(d)(3), 47 CFR § 64.1200(a)(9)(i)(F) and (d)(3), and new sections 64.1200(a)(10), and 64.1200(a)(11), 47 CFR § 64.1200(a)(10) and (a)(11), which may contain new or modified information collection requirements under the Paperwork Reduction Act (PRA), will not be effective until six months following review by Office of Management and Budget (OMB).  We agree with several commenters that compliance with these rule changes necessitates an extended period of time to ensure that affected parties can take measures to implement these changes.[73] Therefore, based on our review of the record and these considerations, we believe the appropriate timeframe for implementation of these amended rules is six months following publication in the Federal Register of notice that OMB has completed any required review of the adopted rules.[74]  The Commission will publish a notice in the Federal Register announcing the effective date for such rules and issue a Public Notice once that date has been established.

## IV.    FURTHER NOTICE OF PROPOSED RULEMAKING

### A.    Wireless Provider Exemption

35.    We seek comment on whether the TCPA applies to robocalls and robotexts from wireless providers to their own subscribers and therefore such providers must have consent to make prerecorded voice, artificial voice, or autodialed calls or texts to their own subscribers.  We seek comment on whether wireless providers satisfy any TCPA consent obligation pursuant to the unique nature of the relationship and service that they provide to their subscribers.[75]  Specifically, we ask whether wireless providers require additional consent beyond that provided by the unique nature of this relationship with their subscribers to satisfy this requirement.  To the extent that wireless providers have consent to robocall or robotext their own subscribers, we propose that wireless subscribers, as any other called party, be able to revoke such consent by communicating a revocation of consent request to their wireless provider and that such request must be honored.  We seek comment on these issues as set forth in more detail below.[76]

36.    In the *2023 TCPA Consent NPRM*, we proposed to require wireless providers to honor their customers' requests to cease robocalls and robotexts.[77]  To effectuate this result, we proposed at that time to create and codify a qualified exemption—based on our authority under section 227(b)(2)(C)—for informational robocalls and robotexts from wireless providers to their subscribers, subject to certain conditions including honoring requests to opt out of such communications.[78]  In response to requests for comments on this proposal, wireless providers suggest that the TCPA's prohibitions do not apply to

---

[72] As noted, the TCPA does not define the term "prior express consent."

[73] *See, e.g.*, ABA Comments at 17 (should allow 18 months); ACA Comments (rules should become effective 18 months after publication in the Federal Register); EEI Comments at 17; UHG Comments (requesting 12 months after publication); NCLC et al. Reply Comments at 5 (arguing that a six-month compliance period is likely to result in more efficient implementation).

[74] We note that the implementation period will be longer than six months because of the additional time required for OMB to approve the information collections associated with the new rules.  As a result, the actual timeframe before the rules adopted herein become effective will be consistent with the longer timeframes recommended by some commenters.

[75] *See* 47 U.S.C. § 227(b)(1).

[76] We note that this proposal differs from that contained in the *TCPA Consent NPRM*.

[77] *See TCPA Consent NPRM* at paras. 21-26.

[78] *Id*.

communications from wireless providers to their subscribers because there is no charge to the subscriber and they have a unique relationship with their subscribers.[79]  In light of these arguments, we now revisit that proposal.

37.        We now seek further comment on the argument that, pursuant to the *1992 TCPA Order* or statutory language, wireless providers are wholly excluded from the application of the TCPA's requirement to obtain consent before robocalling or robotexting their own subscribers because there is no charge imposed on the subscriber.[80]  In 1992, the Commission concluded that wireless carriers need not obtain "additional consent" prior to initiating autodialed, artificial voice, or prerecorded voice calls to their own subscribers.[81]  Although it stated that such robocalls could be made by wireless providers to their own subscribers without a charge, the Commission did not specify whether it intended to wholly exclude wireless providers from the statutory obligation to obtain consent based solely on the calls being free to the called party.[82]  Moreover, shortly following this ruling Congress amended the TCPA to grant the Commission express statutory authority to exempt from the prior-express-consent requirement calls to wireless numbers *that are not charged to the called party* subject to such conditions as the Commission deems necessary to protect the privacy rights afforded under the TCPA.[83]  Section 227(b)(2)(C)'s authority to grant exemptions from the prior-express-consent requirement is predicated on the ability of callers to make such calls with no charge to the consumer.[84]  We believe Congress could not have meant the pre-amended TCPA to exempt free calls from the consent requirement because its amendment describes exactly how the Commission must go about that, including an analysis of each type of exempted call and an affirmative showing that such an exemption does not unduly harm consumer privacy.

38.        Similarly, we are not persuaded that the pre-amended TCPA itself exempts robocalls to wireless subscribers for which there is no charge.  The TCPA prohibits robocalls absent an emergency purpose or with the prior express consent of the called party "to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call."[85]  As the Court of Appeals for the Eleventh Circuit explained in interpreting this provision: "[t]he rule of the last antecedent requires the phrase 'for which the called party is charged for the call,' [in section 227(b)(1)], 'to be applied to the words or phrase immediately preceding (i.e. "any service"), and not to be construed as extending to or

---

[79] *See, e.g.*, AT&T Comments at 1-6; CTIA Comments at 3-4; NLA Comments at 2-3; Verizon Comments at 1-7.

[80] *See, e.g.*, AT&T Comments at 1-2; CTIA Comments at 10; Verizon Comments at 14-17 ("The 1992 Commission correctly recognized that wireless carriers do not need to 'obtain additional consent' to communicate with their customers for free – the only consent required is that intrinsic to the relationship between common carriers and their customers.").

[81] *See 1992 TCPA Order*, 7 FCC Rcd at 8774, para. 45.

[82] The Commission has made reference to the *1992 TCPA Order's* ruling on wireless providers on other occasions without making changes to that ruling, but shed no further light on the underlying basis for that decision.  For example, in 2020, the Commission was tasked with reviewing the exemptions granted under section 227(b)(2)(B) or (C) to ensure that they included certain conditions.  In so doing, the Commission noted that, because the *1992 TCPA Order's* ruling on wireless providers was not taken pursuant to section 227(b)(2)(B) or (C), it did not fall within the scope of the 2020 undertaking.  *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 35 FCC Rcd 15188 at 15204, para. 50 (2020).

[83] *See* Telephone Disclosure and Dispute Resolution Act, Pub. L. No. 102-556, 106 Stat 4181 (1992); 47 U.S.C. § 227(b)(2)(C).

[84] *See* 47 U.S.C. § 227(b)(2)(C).  Specifically, section 227(b)(2)(C) provides that the Commission "may, by rule or order, exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service *that are not charged to the called party*, subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights this section is intended to protect" (emphasis added).

[85] *See* 47 U.S.C. § 227(b)(1).

including others more remote."[86]  As the court concluded "[i]f the phrase 'any service for which the called party is charged for the call' requires that the party be charged per call for the 'paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service' in order for the party to prohibit autodialed calls, then the listing of these services would be superfluous because they are already included under the term 'any service for which the called party is charged.'"[87]  Another federal circuit court decision has reached the same conclusion.[88]

39.     This interpretation of the relevant statutory provision is consistent with the Commission's own treatment of robocalls to wireless numbers for which there is no charge to the called party.  For example, the Commission has allowed certain specific categories of robocalls to wireless telephone numbers that can be made without a charge to the called party only when they have been granted an exemption from the TCPA's consent obligation.[89]  We, therefore, seek comment on the contention that either the *1992 TCPA Order* or the TCPA itself wholly excludes wireless providers from the TCPA's consent requirement when communicating with their own subscribers solely because their calls and texts are free to their subscribers.[90]  Rather, read in light of the subsequent statutory amendment, we believe the *1992 TCPA Order's* reference to the ability of wireless providers to communicate with their subscribers without imposing any charge on those subscribers is an example of the unique nature of the wireless provider and subscriber relationship that supported the Commission's conclusion that such providers need not obtain "additional consent" under the TCPA to robocall their own subscribers.  We seek comment on this analysis.

40.     Having proposed to confirm that wireless providers are subject to the TCPA when communicating with their subscribers, we seek comment on whether wireless providers have effectively obtained consent to make robocalls and send robotexts to their own subscribers by virtue of their unique relationship with their subscribers.  Several wireless providers citing the *1992 TCPA Order* contend that an inherent unique relationship renders it unnecessary to obtain any additional form of consent to communicate with their own subscribers.[91]

41.     Wireless providers are in a unique position to accurately obtain, track, and maintain records of their subscribers' activities, including prepaid subscribers, to ensure that they are sent critical, time-sensitive information to avoid inadvertently losing their wireless service or experiencing bill shock from overages or roaming fees.[92]  The Commission has acknowledged the benefit of these communications and has encouraged wireless providers to send them to their wireless subscribers.[93]  In

---

[86] *See Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1257 (11th Cir. 2014) ("We therefore presume that Congress did not intend the phrase 'for which the called party is charged for the call' to apply to cellular telephone services").

[87] *Id*. at 1258.

[88] *See Susinno v. Work Out World Inc.*, 862 F.3d 346, 349 (3d Cir. 2017) ("If it were the case (as WOW suggests) that cell phone calls not charged to the recipient were not covered by the general prohibition, there would have been no need for Congress to grant the FCC discretion to exempt some of those calls.").

[89] *See, e.g.*, *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Order, 29 FCC Rcd 3432, 3437-38, para. 19 (2014) (exempting package delivery calls to wireless consumers that are not charged to the called party).

[90] *See, e.g.*, CTIA Comments at 10; Verizon Comments at 7.

[91] *See, e.g.*, AT&T Comments at 1-2; CTIA Comments at 3; Verizon Comments at 1.  *See also* NCLC Comments at 2 (suggesting that wireless providers have consent for these calls and texts by virtue of the contracts with their customers).

[92] *See, e.g.*, CTIA Comments at 2-4.

[93] *See, e.g.*, *Empowering Consumers to Avoid Bill Shock; Consumer Information and Disclosure*, CC Docket Nos. 09-158, 10-207, Notice of Proposed Rulemaking, 25 FCC Rcd 14625 (2010) (concluding that it would be beneficial

(continued….)

some instances, the Commission's rules require these communications so that, for example, low-income consumers do not inadvertently lose benefits that make their service affordable.[94]  The ability to provide such information is a unique function of the wireless provider and subscriber relationship that advances the interests of consumers by ensuring they are informed of any potential risk to the ongoing provision of their wireless service.  As a result, we agree that wireless providers have a unique relationship that allows them to send critical information to their subscribers that their subscribers may welcome.[95]  In addition, wireless providers are in a unique position in that they offer the specific service over which these communications are made, including the provision of the unique telephone number at which subscribers are contacted over that service.  We seek comment on whether the nature of this unique relationship and service continues to render it unnecessary for wireless providers to obtain any additional consent from their subscribers, as the Commission concluded in the *1992 TCPA Order*.  We seek comment on whether that view is incorrect, e.g., because the TCPA requires a more affirmative statement from a consumer that they consent to robocalls.  Parties arguing for this conclusion should state whether such a view could upset the status quo such that millions of subscribers who may currently receive robocalls and robotexts they welcome from their providers would no longer be able to receive them unless they take steps to consent.  And, if so, we seek comment on how we should proceed to avoid inadvertently disrupting the flow of information that wireless subscribers have come to expect or burdening wireless providers with the necessity of obtaining such consent from their existing subscribers.[96]

42.    Should the Commission determine that wireless providers are required to obtain consent and have effectively obtained consent to make robocalls and send robotexts to their own subscribers by virtue of their unique relationship with their subscribers, we seek comment on whether this consent should extend to robocalls and robotexts that contain telemarketing or advertisements.  In 2012, the Commission adopted rules requiring prior express consent to be obtained in writing for autodialed or prerecorded telemarketing calls to wireless numbers.[97]  In so doing, however, the Commission has not extended this requirement to robocalls made by a wireless provider to their own subscribers.[98]  As a result, we seek comment on whether we should revisit this issue to require prior express written consent to be obtained for any such robocall or robotext that contains telemarketing or advertising.

43.    We seek comment on whether the right to revoke consent extends to wireless subscribers when they receive unwanted robocalls and robotexts from their wireless provider, just as it does to any robocalls or texts sent pursuant to the TCPA.[99]  As a result, we seek comment on whether wireless providers must honor any revocation or opt-out requests from their own subscribers that are made through any reasonable means and at any time.  We seek comment on whether, if we were to find wireless providers have consent based on having a unique relationship with their subscribers, we should codify a new rule to that effect that would make clear consumers also have a right to revoke consent to such

---

for consumers to receive usage alerts from their wireless providers and proposing rules that would require wireless providers to provide usage alerts for overages and international or roaming charges).

[94] *See, e.g.*, NLA Comments at 2-3 (noting the Commission's rules that obligate providers to communicate with subscribers regarding de-enrollment in the Lifeline and ACP programs); Verizon Comments at 4-5.

[95] *See, e.g.*, AT&T Comments at 4-6; NLA Comments at 2-3; Verizon Comments at 4-6.

[96] In seeking comment on these issues, we do not intend to disturb current or past wireless provider practices regarding making robocalls and sending robotexts to their subscribers.  We anticipate that any action the Commission may take in the future will be prospective and will not impact providers' current calling behavior.

[97] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 27 FCC Rcd 1830, 1837, para. 20 (2012); 47 CFR § 64.1200(a)(2).

[98] *Id.* at 1840-41, para. 27.

[99] *See 2015 TCPA Declaratory Ruling*, 30 FCC Rcd at 7993-99, paras. 55-70 (confirming that consumers who have provided consent to receive autodialed or prerecorded calls may revoke such consent through any reasonable means).

communications. Although many of the messages sent by wireless providers to their own subscribers may be welcome and provide useful information, as wireless commenters suggest, we do not believe there is any reason to deprive wireless subscribers of the same right to exercise revocation of consent when they make an affirmative request not to receive such communications. In this circumstance, the subscriber has made clear that they do not wish to receive such further communications from their wireless provider regardless of the merits of the robocalls and robotexts that they receive.[100] The record in this matter confirms that at least some wireless subscribers do not wish to receive these communications from their wireless provider.[101]

44. We do not believe that any obligation to honor revocation requests is unduly burdensome to wireless providers. In fact, the record suggests that some wireless providers already honor opt-out requests on many communications to subscribers.[102] Other callers have implemented such measures for decades to comply with our rules. Nevertheless, we seek comment on ways to reduce any new burdens such a requirement might entail, including for smaller wireless providers. We seek comment on this proposal and any other issues commenters may wish to raise in this context, including any alternative proposals set forth in the *TCPA Consent NPRM* that would allow us to balance consumer privacy rights without unduly interfering with the ability of wireless providers to communicate critical information to their subscribers.

### B. Expanding Opt-Out Requirements

45. We seek comment on NCLC's request that the Commission amend section 64.1200(b)(3) of our rules to require an automated opt-out mechanism on *every* call that contains an artificial or prerecorded voice.[103] NCLC argues that consumers "complain about the seemingly unstoppable" prerecorded non-marketing calls from entities such as medical professionals and, in NCLC's view, that would harmonize the treatment of such calls with those to residential lines.[104] We seek comment on this proposal, including whether such a change is necessary and what the compliance costs of such a change would be on callers including any alternatives that would minimize compliance burdens on smaller entities. [105]

## V. PROCEDURAL MATTERS

46. *Paperwork Reduction Act.* This document may contain new or modified information collection requirements subject to PRA, Public Law 104-13. All such new or modified information collection requirements will be submitted to OMB for review under § 3507(d) of the PRA. OMB, the general public, and other Federal agencies will be invited to comment on any new or modified information collection requirements contained in this proceeding. In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. § 3506(c)(4), we previously sought specific comment on how the Commission might further reduce the information

---

[100] As discussed above, wireless providers will have the opportunity to send one last confirmation text to their subscriber informing the recipient of the scope of the opt-out request absent some further confirmation from the consumer that they wish to continue receiving certain categories of text messages from the sender. This will provide subscribers an opportunity to make clear whether they wish to receive certain types of robocalls and robotexts from their provider.

[101] *See, e.g.*, Williams Comments ("[u]nwanted communication is unwanted communication, no matter the source"); *Armbruster Petition*; *Cranor Petition*.

[102] *See* Verizon Comments at 10.

[103] *See* Letter from Margot Saunders, Senior Counsel, NCLC, to Marlene H. Dortch, Secretary, FCC, filed in CG Docket 02-278 (dated Feb. 5, 2024) [emphasis added]; NCLC et al. Reply Comments at 3.

[104] *See id.*

[105] Our current rules mandate the use of automated, interactive opt-out mechanisms only in certain specific instances. *See* 47 CFR § 64.1200(a)(9), (b)(3).

collection burden for small business concerns with fewer than 25 employees, and we received no comments.

47.        In this present document, we have assessed the effects of the rules adopted herein that may impose collection burdens on small business concerns to implement measures to process revocation of consent requests to robocall or robotext consumers.  We find that, to the extent these requirements constitute an information collection, such collection will not present a substantial burden for small business concerns with fewer than 25 employees and that any such burdens are outweighed by the benefits to consumers in affording them protections from unwanted calls and text messages.

48.        *Regulatory Flexibility Act.*  The Regulatory Flexibility Act of 1980, as amended, (RFA),[106] requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[107]  Accordingly, we have prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the possible impact of the rule changes contained in this *Order* on small entities.  The FRFA is set forth in Appendix B.

49.        We have also prepared an Initial Regulatory Flexibility Analysis (IRFA) concerning the potential impact of the rule and policy changes contained in the *Further Notice of Proposed Rulemaking*. The IRFA is set forth in Appendix C.  Written public comments are requested on the IRFA.  Comments must be filed by the deadlines for comments on the *Further Notice of Proposed Rulemaking* indicated on the first page of this document and must have a separate and distinct heading designating them as responses to the IRFA.

50.        *Congressional Review Act*.  The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, OMB concurs, that these rules are "non-major" under the Congressional Review Act, 5 U.S.C. § 804(2).  The Commission will send a copy of this *Report and Order* to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).

51.        *Ex Parte Rules*.  The proceeding shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's ex parte rules.[108]  Persons making ex parte presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral ex parte presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the ex parte presentation was made, and (2) summarize all data presented and arguments made during the presentation.  If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum.  Documents shown or given to Commission staff during ex parte meetings are deemed to be written ex parte presentations and must be filed consistent with section 1.1206(b) of the Commission's rules.  In proceedings governed by section 1.49(f) of the Commission's rules or for which the Commission has made available a method of electronic filing, written ex parte presentations and memoranda summarizing oral ex parte presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that

---

[106] 5 U.S.C. §§ 601-612.  The RFA has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[107] 5 U.S.C. § 605(b).

[108] 47 CFR §§ 1.1200 *et seq*.

proceeding, and must be filed in their native format (e.g., .doc, .xml, .ppt, searchable .pdf). Participants in this proceeding should familiarize themselves with the Commission's ex parte rules.[109]

52.        *Filing of Comments and Reply Comments*. Pursuant to sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document. Comments may be filed using the Commission's Electronic Comment Filing System (ECFS). *See* Electronic Filing of Documents in Rulemaking Proceedings, 63 FR 24121 (1998).

> • Electronic Filers: Comments may be filed electronically using the Internet by accessing the ECFS: www.fcc.gov/ecfs.

> • Paper Filers: Parties who choose to file by paper must file an original and one copy of each filing.

> • Filings can be sent by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail. All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

> • Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701. U.S. Postal Service first class, Express, and Priority mail must be addressed to 45 L Street NE, Washington, D.C. 20554.

> • Effective March 19, 2020, and until further notice, the Commission no longer accepts any hand or messenger delivered filings. This is a temporary measure taken to help protect the health and safety of individuals, and to mitigate the transmission of COVID-19. *See FCC Announces Closure of FCC Headquarters Open Window and Change in Hand-Delivery Policy*, Public Notice, 35 FCC Rcd 2788 (OMD 2020).

53.        *People with Disabilities*. To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer and Governmental Affairs Bureau at 202-418-0530 (voice).

54.        *Availability of Documents.* This Order will be available via ECFS. Documents will be available electronically in ASCII, Microsoft Word, and/or Adobe Acrobat. These documents will also be available for public inspection during regular business hours in the FCC Reference Center, Federal Communications Commission, 45 L Street NE, Washington, D.C. 20554.

55.        *Additional Information.* For additional information on this proceeding, contact Richard D. Smith, Richard.Smith@fcc.gov or (717) 338-2797, Consumer and Governmental Affairs Bureau, Consumer Policy Division.

## VI.    ORDERING CLAUSES

56.        Accordingly, **IT IS ORDERED**, pursuant to section  227 of the Communications Act of 1934, as amended, 47 U.S.C. §227, that this *Report and Order and Further Notice of Proposed Rulemaking* is hereby **ADOPTED**, and that Part 64 of the Commission's rules, 47 CFR Part 64, is amended as set forth in Appendix A.

57.        **IT IS FURTHER ORDERED** that this *Report and Order* **SHALL BE EFFECTIVE** 30 days after publication in the Federal Register, except that the amendments to sections 64.1200(a)(9)(i)(F) and 64.1200(d)(3), and new sections 64.1200(a)(10), and 64.1200(a)(11), 47 CFR § 64.1200(a)(9)(i)(F), (a)(10), (a)(11), and (d)(3), which may contain new or modified information collection requirements, will not be required until six months after OMB completes review of any information collection requirements that the Consumer and Governmental Affairs Bureau determines is required under the Paperwork

---

[109] 47 CFR § 1.49(f).

Reduction Act.  The Commission directs the Consumer and Governmental Affairs Bureau to announce compliance dates by publication in the Federal Register and by subsequent Public Notice.

58.     **IT IS FURTHER ORDERED** that the Petition for Declaratory Ruling filed by Capital One Services in CG Docket No. 02-278 on November 1, 2019, **IS DISMISSED.**

59.     **IT IS FURTHER ORDERED** that the Petition for Declaratory Ruling filed by Mobile Media Technologies in CG Docket No. 02-278 on April 5, 2016, **IS DISMISSED.**

60.     **IT IS FURTHER ORDERED** that the Commission **SHALL SEND** a copy of this *Order* to Congress and to the Governmental Accountability Office pursuant to the Congressional Review Act, see 5 U.S.C. § 801(a)(1)(A).

61.     **IT IS FURTHER ORDERED** that the Commission's Office of Secretary **SHALL SEND** a copy of this *Report and Order and Further Notice of Proposed Rulemaking*, including the Initial and Final Regulatory Flexibility Analyses, to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

**APPENDIX A**

**Final Rules**

For the reasons discussed above, the Federal Communications Commission amends 47 CFR part 64 as follows:

PART 64 – MISCELLANEOUS RULES RELATING TO COMMON CARRIERS

1.    The authority citation for part 64 continues to read as follows:

Authority: 47 U.S.C. 151, 152, 154, 201, 202, 217, 218, 220, 222, 225, 226, 227, 227b, 228, 251(a), 251(e), 254(k), 255, 262, 276, 301, 316, 345, 403(b)(2)(B), (c), 616, 620, 716, 1401-1473, unless otherwise noted; Div. P, Pub. L. 115-141, 132 Stat. 348, 1091; sec. 5, Pub. L. 117-223, 136 Stat 2280, 2285-88 (47 U.S.C 345 note).

2.    Section 64.1200 is amended by revising paragraph (a)(9)(i)(F), adding paragraphs (a)(10) through (12) and revising paragraph (d)(3) to read as follows:

Subpart L – Restrictions on Telemarketing, Telephone Solicitation, and Facsimile Advertising

§ 64.1200  Delivery Restrictions.

(a) * * *

(9) * * *

(i) * * *

(F) The package delivery company must offer package recipients the ability to opt out of receiving future delivery notification calls and messages and must honor an opt-out request within a reasonable time from the date such request is made, not to exceed six business days; and,

* * * * *

(10) A called party may revoke prior express consent, including prior express written consent, to receive calls or text messages made pursuant to paragraphs (a)(1) through (3) and (c)(2) of this section by using any reasonable method to clearly express a desire not to receive further calls or text messages from the caller or sender.  Any revocation request made using an automated, interactive voice or key press-activated opt-out mechanism on a call; using the words "stop," "quit," "end," "revoke," "opt out," "cancel," or "unsubscribe" sent in reply to an incoming text message; or pursuant to a website or telephone number designated by the caller to process opt-out requests constitutes a reasonable means per se to revoke consent.  If a called party uses any such method to revoke consent, that consent is considered definitively revoked and the caller may not send additional robocalls and robotexts.  If a reply to an incoming text message uses words other than "stop," "quit," "end," "revoke," "opt out," "cancel," or "unsubscribe," the caller must treat that reply text as a valid revocation request if a reasonable person would understand those words to have conveyed a request to revoke consent.  Should the text initiator choose to use a texting protocol that does not allow reply texts, it must provide a clear and conspicuous disclosure on each text to the consumer that two-way texting is not available due to technical limitations of the texting protocol, and clearly and conspicuously provide on each text reasonable alternative ways to revoke consent.  All requests to revoke prior express consent or prior express written consent

made in any reasonable manner must be honored within a reasonable time not to exceed ten business days from receipt of such request.  Callers or senders of text messages covered by paragraphs (a)(1) through (3) and (c)(2) of this section may not designate an exclusive means to request revocation of consent.

(11) The use of any other means to revoke consent not listed in paragraph (a)(10), such as a voicemail or email to any telephone number or email address intended to reach the caller, creates a rebuttable presumption that the consumer has revoked consent when the called party satisfies their obligation to produce evidence that such a request has been made, absent evidence to the contrary.  In those circumstances, a totality of circumstances analysis will determine whether the caller can demonstrate that a request to revoke consent has not been conveyed in a reasonable manner.

(12) A one-time text message confirming a request to revoke consent from receiving any further calls or text messages does not violate paragraphs (a)(1) through (2) of this section as long as the confirmation text merely confirms the text recipient's revocation request and does not include any marketing or promotional information, and is the only additional message sent to the called party after receipt of the revocation request.  If the confirmation text is sent within five minutes of receipt, it will be presumed to fall within the consumer's prior express consent.  If it takes longer, however, the sender will have to make a showing that such delay was reasonable.  To the extent that the text recipient has consented to several categories of text messages from the text sender, the confirmation message may request clarification as to whether the revocation request was meant to encompass all such messages; the sender must cease all further texts for which consent is required absent further clarification that the recipient wishes to continue to receive certain text messages.

* * * * *

(d) * * *

(3) *Recording, disclosure of do-not-call requests*.  If a person or entity making an artificial or prerecorded-voice telephone call pursuant to an exemption under § 64.1200(a)(3)(ii) through (v) or any call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making such calls (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made.  This period may not exceed ten (10) business days from the receipt of such request.  If such requests are recorded or maintained by a party other than the person or entity on whose behalf the call is made, the person or entity on whose behalf the call is made will be liable for any failures to honor the do-not-call request.  A person or entity making an artificial or prerecorded-voice telephone call pursuant to an exemption under § 64.1200(a)(3)(ii) through (v) or any call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a call is made or an affiliated entity.

* * * * *

21

Federal Communications Commission                                          FCC 24-24

**APPENDIX B**

**Final Regulatory Flexibility Analysis**

1.        As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] an Initial Regulatory Flexibility Analysis (IRFA) was incorporated into the *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, released in June 2023 (*TCPA Consent NPRM*).[2]  The Federal Communications Commission (Commission) sought written public comment on the proposals in the *TCPA Consent NPRM*, including comment on the IRFA.  The comments received are discussed below in Section B.  This Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[3]

### A.        Need for, and Objectives of, the Order

2.        The *Order* clarifies and strengthens the right of consumers to grant or revoke consent to receive robocalls and robotexts under the Telephone Consumer Protection Act of 1991 (TCPA).[4]  Under the TCPA, certain types of calls and texts may only be sent with the prior express consent of the called party.[5]  The ability of consumers to exercise this right to provide or revoke consent is essential to protecting the privacy rights of consumers by allowing them to decide which callers may communicate with them via robocalls and robotexts.

3.        In addition, the *Order* codifies prior Commission rulings and adopts new requirements to ensure that the requirements relating to providing or revoking consent under the TCPA are clear to both callers and consumers.  Specifically, the *Order* makes clear that consumers may revoke prior express consent in any reasonable manner that clearly expresses a desire not to receive further calls or text messages, including using an automated, interactive voice or key press-activated opt-out mechanism on a call, using the words "stop," "quit," "end," "revoke," "opt out," "cancel," or "unsubscribe" sent in reply to an incoming text message, or pursuant to a website designated by the caller to process opt-out requests.  These approaches constitute a reasonable means to revoke consent and that callers may not infringe on that right by designating an exclusive means to revoke consent that precludes the use of any other reasonable method.

4.        The *Order* also requires that callers honor do-not-call and revocation requests in a reasonable time not to exceed ten business days of receipt.  Further, the *Order* reiterates that consumers only need to revoke consent once to stop getting all calls and texts from a specific entity.  It also codifies that a one-time text message confirming a consumer's request that no further text messages be sent does not violate the TCPA or the Commission's rules as long as the confirmation text merely confirms the called party's opt-out request, does not include any marketing or promotional information, and the text is the only additional message sent to the called party after receipt of the opt-out request.[6]

---

[1] 5 U.S.C. § 603.  The RFA, 5 U.S.C. §§ 601-612, was amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. 104-121, Title II, 110 Stat. 857 (1996).

[2] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Notice of Proposed Rulemaking, FCC 23-49, Appx. B (June 9, 2023) (*TCPA Consent NPRM*).

[3] 5 U.S.C. § 604.

[4] *TCPA Consent NPRM* at paras. 9-26; *see also* Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act, Pub. L. No. 116-105, 133 Stat. 3274 (2019) (TRACED Act); TRACED Act § 8; Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991) (codified at 47 U.S.C. § 227) (TCPA).

[5] 47 U.S.C. § 227(b).

[6] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Soundbite Communications, Inc.*, CG Docket No. 02-278, Declaratory Ruling, 27 FCC Rcd at 15391, paras. 7-12 (2012).

**B.      Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

5.        There were no comments filed that specifically addressed the rules and policies proposed in the IRFA. Several commenter did, however, make reference to the potential compliance burdens including the impact on small businesses. Commenters contend that compliance with an obligation to honor revocation of consent requests within 24-hours would be burdensome for small entities.[7]  We address these concerns below in section F.

**C.      Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration**

6.        Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments.[8]  The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

**D.      Description and Estimate of the Number of Small Entities to Which the Rules Will Apply**

7.        The RFA directs agencies to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein.[9]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[10]  In addition, the term "small business" has the same meaning as the term "small-business concern" under the Small Business Act.[11]  A "small-business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[12]

8.        *Small Businesses, Small Organizations, Small Governmental Jurisdictions.*  Our actions, over time, may affect small entities that are not easily categorized at present.  We, therefore describe at the outset, three broad groups of small entities that could be directly affected herein.[13]  First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees.[14]  These types of small businesses represent 99.9% of all businesses in the United States, which translates to 33.2 million businesses.[15]

---

[7] *See* Illinois Credit Comments at 2; MEF Comments at 6; NAMIC Comments at 2-3; EEI Reply Comments at 6.

[8] 5 U.S.C. § 604(a)(3).

[9] *Id*. § 604(a)(4).

[10] *Id*. § 601(6).

[11] *Id*. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[12] 15 U.S.C. § 632.

[13] 5 U.S.C. § 601(3)-(6).

[14] *See* SBA, Office of Advocacy, "What's New With Small Business?," https://advocacy.sba.gov/wp-content/uploads/2023/03/Whats-New-Infographic-March-2023-508c.pdf (Mar. 2023).

[15] *Id*.

9.      Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[16]  The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations.[17]  Nationwide, for tax year 2020, there were approximately 447,689 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.[18]

10.      Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand."[19]  U.S. Census Bureau data from the 2017 Census of Governments[20] indicate there were 90,075 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States.[21]  Of this number, there were 36,931 general purpose governments (county,[22] municipal, and town or township[23]) with populations of less than 50,000 and 12,040 special purpose governments—independent school districts[24] with enrollment

---

[16] *See* 5 U.S.C. § 601(4).

[17] The IRS benchmark is similar to the population of less than 50,000 benchmark in 5 U.S.C § 601(5) that is used to define a small governmental jurisdiction.  Therefore, the IRS benchmark has been used to estimate the number of small organizations in this small entity description.  S*ee* Annual Electronic Filing Requirement for Small Exempt Organizations – Form 990-N (e-Postcard), "Who must file," https://www.irs.gov/charities-non-profits/annual-electronic-filing-requirement-for-small-exempt-organizations-form-990-n-e-postcard.  We note that the IRS data does not provide information on whether a small exempt organization is independently owned and operated or dominant in its field.

[18] *See* Exempt Organizations Business Master File Extract (EO BMF), "CSV Files by Region," https://www.irs.gov/charities-non-profits/exempt-organizations-business-master-file-extract-eo-bmf.  The IRS Exempt Organization Business Master File (EO BMF) Extract provides information on all registered tax-exempt/non-profit organizations.  The data utilized for purposes of this description was extracted from the IRS EO BMF data for businesses for the tax year 2020 with revenue less than or equal to $50,000 for Region 1-Northeast Area (58,577), Region 2-Mid-Atlantic and Great Lakes Areas (175,272), and Region 3-Gulf Coast and Pacific Coast Areas (213,840) that includes the continental U.S., Alaska, and Hawaii.  This data does not include information for Puerto Rico.

[19] *See* 5 U.S.C. § 601(5).

[20] *See* 13 U.S.C. § 161.  The Census of Governments survey is conducted every five (5) years compiling data for years ending with "2" and "7".  *See also* Census of Governments, https://www.census.gov/programs-surveys/cog/about.html.

[21] *See* U.S. Census Bureau, 2017 Census of Governments – Organization Table 2.  Local Governments by Type and State: 2017 [CG1700ORG02], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  Local governmental jurisdictions are made up of general purpose governments (county, municipal and town or township) and special purpose governments (special districts and independent school districts).  *See also* tbl.2. CG1700ORG02 Table Notes_Local Governments by Type and State_2017.

[22] *See id.* at tbl.5.  County Governments by Population-Size Group and State: 2017 [CG1700ORG05], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 2,105 county governments with populations less than 50,000.  This category does not include subcounty (municipal and township) governments.

[23] *See id.* at tbl.6.  Subcounty General-Purpose Governments by Population-Size Group and State: 2017 [CG1700ORG06], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 18,729 municipal and 16,097 town and township governments with populations less than 50,000.

[24] *See id.* at tbl.10.  Elementary and Secondary School Systems by Enrollment-Size Group and State: 2017 [CG1700ORG10], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 12,040 independent school districts with enrollment populations less than 50,000.  *See also* tbl.4.  Special-Purpose Local Governments by State Census Years 1942 to 2017 [CG1700ORG04], CG1700ORG04 Table Notes_Special Purpose Local Governments by State_Census Years 1942 to 2017.

populations of less than 50,000.[25]  Accordingly, based on the 2017 U.S. Census of Governments data, we estimate that at least 48,971 entities fall into the category of "small governmental jurisdictions."[26]

11.      *Telemarketing Bureaus and Other Contact Centers.*  This industry comprises establishments primarily engaged in operating call centers that initiate or receive communications for others-via telephone, facsimile, email, or other communication modes-for purposes such as (1) promoting clients, products, or services, (2) taking orders for clients, (3) soliciting contributions for a client, and (4) providing information or assistance regarding a client's products or services.[27]  These establishments do not own the product or provide the services they are representing on behalf of clients.[28]  The SBA small business size standard for this industry classifies firms having $16.5 million or less in annual receipts as small.[29]  According to U.S. Census Bureau data for 2017, there were 2,250 firms in this industry that operated for the entire year.[30]  Of this number 1,435 firms had revenue of less than $10 million.[31]  Based on this information, the majority of firms in this industry can be considered small under the SBA small business size standard.

12.      *Wireless Telecommunications Carriers (except Satellite).*  This industry comprises establishments engaged in operating and maintaining switching and transmission facilities to provide communications via the airwaves.[32]  Establishments in this industry have spectrum licenses and provide services using that spectrum, such as cellular services, paging services, wireless Internet access, and wireless video services.[33]  The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[34]  U.S. Census Bureau data for 2017 show that there were 2,893 firms in this

---

[25] While the special purpose governments category also includes local special district governments, the 2017 Census of Governments data does not provide data aggregated based on population size for the special purpose governments category.  Therefore, only data from independent school districts is included in the special purpose governments category.

[26] This total is derived from the sum of the number of general purpose governments (county, municipal and town or township) with populations of less than 50,000 (36,931) and the number of special purpose governments - independent school districts with enrollment populations of less than 50,000 (12,040), from the 2017 Census of Governments - Organizations tbls. 5, 6 & 10.

[27] *See* U.S. Census Bureau, *2017 NAICS Definition,"561422 Telemarketing Bureaus and Other Contact Centers,"* https://www.census.gov/naics/?input=561422&year=2017&details=561422.

[28] *Id.*

[29] 13 CFR § 121.201, NAICS Code 561422.

[30] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 561422, https://data.census.gov/cedsci/table?y=2017&n=561422&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[31] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We note that the U.S. Census Bureau withheld publication of the number of firms that operated with sales/value of shipments/revenue in the individual categories for less than $100,000, and $100,000 to $249,999, to avoid disclosing data for individual companies (see Cell Notes for the sales/value of shipments/revenue in these categories).  Therefore, the number of firms with revenue that meet the SBA size standard would be higher than noted herein.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[32] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite),"* https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[33] *Id.*

[34] 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

industry that operated for the entire year.[35]  Of that number, 2,837 firms employed fewer than 250 employees.[36]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 594 providers that reported they were engaged in the provision of wireless services.[37]  Of these providers, the Commission estimates that 511 providers have 1,500 or fewer employees.[38]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

### E.  Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities

13.  The rules adopted in the *Order* may result in modified reporting, recordkeeping, or other compliance requirements for small entities.  In cases where consumers invoke their right to grant or revoke consent to small entity callers to receive robocalls and robotexts under the TCPA, these callers may need to implement new methods to record and track such revocation requests to honor them within the specified timeframes.  This includes honoring any revocation or do-not-call requests made by any reasonable means including by using an automated, interactive voice or key press-activated opt-out mechanism on a call, using the words "stop," "quit," "end," "revoke," "opt out," "cancel," or "unsubscribe" sent in reply to an incoming text message, or pursuant to a website designated by the caller when those options are provided by the calling party.  In situations where a text initiator chooses to use a texting protocol that does not allow reply texts, the text initiator must:  (1) provide a clear and conspicuous disclosure in each text to the consumer that two-way texting is not available due to technical limitations of the texting protocol; and (2) clearly and conspicuously provide reasonable alternative ways for a consumer to revoke consent, such as a telephone number, website link, or instructions to text a different number to revoke consent from further unwanted text messages.

14.  In addition, callers must process such requests within a reasonable time not to exceed ten business days of receipt, and within six business days for package delivery services.  This may necessitate small and other entities to update their current systems and processes for handling such requests.

15.  There is not sufficient information on the record to quantify the costs of compliance for small entities, or to determine whether it will be necessary for small entities to hire professionals to comply with the adopted rules.  We note that many of the requirements contained in the *Order* have been adopted by the Commission in rulings dating back many years or even decades.  As a result, we anticipate that many callers, including smaller entities, have already made efforts to comply with these obligations and may have limited new burdens.

### F.  Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered

16.  The RFA requires an agency to provide, "a description of the steps the agency has taken to minimize the significant economic impact on small entities...including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rules and why each one of the

---

[35] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[36] *Id*.  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[37] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[38] *Id.*

other significant alternatives to the rule considered by the agency which affects the impact on small entities was rejected."[39]

17.      In the *Order*, the Commission took steps to minimize significant economic impact on small entities and considered alternatives to the adoption of new rules and processes that may impact small entities.  In response to commenter requests,[40] we provided greater specificity as to the methods that are deemed reasonable to revoke consent.  Taking this step provides callers, including many small entities, with additional guidance regarding the means to comply with our rules.  Alternatively, we declined to allow callers to designate the use of specific technologies to permit consumers to revoke consent, such as the use of reply text messages, and grant callers with the flexibility to process revocation requests by any reasonable means.  We also modified our proposal requiring that the revocation of consent requests and do-not-call requests must be processed within 24-hours.  Rather, in response to concerns from numerous commenters that the 24-hour limitation is not feasible,[41] our amended rules require such requests be honored within a reasonable time not to exceed ten business days.  This provides callers, including many smaller entities, greater flexibility to process revocation requests that are made via any reasonable means.  Without objection, we also amend the exemption that allows package delivery notification robocalls and robotexts, with revocation requests now reduced from 30 business days to requests being honored within a reasonable time not to exceed six business days.  In addition to providing certainty to consumers that their requests are being addressed, there were no objections to this timeframe and the record reflects that this provides package delivery companies, some of which are small entities, a reasonable opportunity to process such requests.  Finally, we codify into our rules the ability of callers to send a final, one-time confirmation text in response to a request to opt-out of further messages.  This will benefit both callers and consumers by allowing confirmation of the consumer's intent to no longer receive calls or text messages from the caller.

### G.      Report to Congress

18.      The Commission will send a copy of the *Order*, including this FRFA, in a report to Congress pursuant to the Congressional Review Act.[42]   In addition, the Commission will send a copy of the *Order*, including this FRFA, to the Chief Counsel for Advocacy of the SBA.  A copy of the *Order* and FRFA (or summaries thereof) will also be published in the Federal Register.[43]

---

[39] 5 U.S.C. § 604(a)(6).

[40] ABA Comments at 6; EEI Comments at 12 (requesting that the Commission further clarify what methods of revoking consent are reasonable); NTCA Comments at 1 (encouraging additional guidance); PACE Comments at 4-6.

[41] ABA Comments at 16 (requesting six business days to process revocation requests); ACA Comments at 16 (noting that the other Commission rules allow 10 business days to honor revocation requests); EEI Comments at 15 (10 business days); NAMIC Comments at 3 (not to exceed 14 business days); NTCA et al. Comments at 5 (72 hours); PACE Comments at 7 (five business days); UHG Comments at 3 (14 days); NCLC et al. Reply Comments at 4 (recommending that the Commission allow a longer period for the first year after the regulation goes into effect).

[42] 5 U.S.C. § 801(a)(1)(A).

[43] *See id*. § 604(b).

**APPENDIX C**

**Initial Regulatory Flexibility Analysis**

1.   As required by the Regulatory Flexibility Act of 1980, as amended (RFA)[1] the Commission has prepared this Initial Regulatory Flexibility Analysis (IRFA) of the possible significant economic impact on a substantial number of small entities by the policies proposed in this *Further Notice of Proposed Rulemaking* (*Further Notice*).  Written public comments are requested on this IRFA.  Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments in the *Further Notice.*  The Commission will send a copy of this *Further Notice*, including this IRFA, to the Chief Counsel for Advocacy of the Small Business Administration (SBA).[2]  In addition, the *Further Notice* and the IRFA (or summaries thereof) will be published in the Federal Register.[3]

### A.      Need for, and Objectives of, the Proposed Rules

2.      In the *Further Notice*, the Commission seeks comment on whether the TCPA applies to robocalls and robotexts from wireless providers to their own subscribers and therefore such providers must have consent to make prerecorded voice, artificial voice, or autodialed calls or texts to their own subscribers.  The Commission seeks comment on whether wireless providers satisfy the TCPA's consent obligation pursuant to the unique nature of the relationship and service that they provide to their subscribers.[4]  To the extent that wireless providers have consent to robocall or robotext their own subscribers, the Commission seeks comment on whether wireless subscribers, as any other called party, can exercise their right to revoke such consent by communicating a revocation of consent request to their wireless provider and that such request must be honored.  Lastly, the Commission seeks comment on a request to amend our rules to require automated opt-out mechanisms for every non-telemarketing call that uses an artificial or prerecorded voice that can be used by the called party to stop such calls.[5]

### B.      Legal Basis

3.      The proposed action is authorized pursuant to section 227 of the Communications Act of 1934, as amended, 47 U.S.C. § 227.

### C.      Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply

4.      The RFA directs agencies to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the proposed rules and policies, if adopted.[6]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[7]  In addition, the term "small business" has

---

[1] 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. §§ 601-612, was amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] 5 U.S.C. § 603(a).

[3] *Id*.

[4] *See* 47 U.S.C. § 227(b)(1).

[5] *See* Letter from Margot Saunders, Senior Counsel, NCLC, to Marlene H. Dortch, Secretary, FCC, filed in CG Docket 02-278 (dated Feb. 5, 2024); NCLC et al. Reply Comments at 3.

[6] *Id.* § 603(b)(3).

[7] *Id.* § 601(6).

the same meaning as the term "small business concern" under the Small Business Act.[8]  A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[9]

5.        *Small Businesses, Small Organizations, Small Governmental Jurisdictions.*  Our actions, over time, may affect small entities that are not easily categorized at present.  We, therefore describe at the outset, three broad groups of small entities that could be directly affected herein.[10]  First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees.[11]  These types of small businesses represent 99.9% of all businesses in the United States, which translates to 33.2 million businesses.[12]

6.        Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[13]  The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations.[14]  Nationwide, for tax year 2020, there were approximately 447,689 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.[15]

7.        Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand."[16]  U.S. Census Bureau data from the 2017 Census

[8] *Id.* § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[9] 15 U.S.C. § 632.

[10] 5 U.S.C. § 601(3)-(6).

[11] *See* SBA, Office of Advocacy, "What's New With Small Business?," https://advocacy.sba.gov/wp-content/uploads/2023/03/Whats-New-Infographic-March-2023-508c.pdf (Mar. 2023).

[12] *Id*.

[13] *See* 5 U.S.C. § 601(4).

[14] The IRS benchmark is similar to the population of less than 50,000 benchmark in 5 U.S.C § 601(5) that is used to define a small governmental jurisdiction.  Therefore, the IRS benchmark has been used to estimate the number of small organizations in this small entity description.  S*ee* Annual Electronic Filing Requirement for Small Exempt Organizations – Form 990-N (e-Postcard), "Who must file," https://www.irs.gov/charities-non-profits/annual-electronic-filing-requirement-for-small-exempt-organizations-form-990-n-e-postcard.  We note that the IRS data does not provide information on whether a small exempt organization is independently owned and operated or dominant in its field.

[15] *See* Exempt Organizations Business Master File Extract (EO BMF), "CSV Files by Region," https://www.irs.gov/charities-non-profits/exempt-organizations-business-master-file-extract-eo-bmf.  The IRS Exempt Organization Business Master File (EO BMF) Extract provides information on all registered tax-exempt/non-profit organizations.  The data utilized for purposes of this description was extracted from the IRS EO BMF data for businesses for the tax year 2020 with revenue less than or equal to $50,000 for Region 1-Northeast Area (58,577), Region 2-Mid-Atlantic and Great Lakes Areas (175,272), and Region 3-Gulf Coast and Pacific Coast Areas (213,840) that includes the continental U.S., Alaska, and Hawaii.  This data does not include information for Puerto Rico.

[16] *See* 5 U.S.C. § 601(5).

of Governments[17] indicate there were 90,075 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States.[18]  Of this number, there were 36,931 general purpose governments (county,[19] municipal, and town or township[20]) with populations of less than 50,000 and 12,040 special purpose governments—independent school districts[21] with enrollment populations of less than 50,000.[22]  Accordingly, based on the 2017 U.S. Census of Governments data, we estimate that at least 48,971 entities fall into the category of "small governmental jurisdictions."[23]

8.        *Wireless Carriers and Service Providers*.  Wireless Telecommunications Carriers (*except Satellite*) is the closest industry with a SBA small business size standard applicable to these service providers.[24]  The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[25]  U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year.[26]  Of this number, 2,837 firms employed fewer than 250 employees.[27]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report,

---

[17] *See* 13 U.S.C. § 161.  The Census of Governments survey is conducted every five (5) years compiling data for years ending with "2" and "7".  *See also* Census of Governments, https://www.census.gov/programs-surveys/cog/about.html.

[18] *See* U.S. Census Bureau, 2017 Census of Governments – Organization Table 2.  Local Governments by Type and State: 2017 [CG1700ORG02], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  Local governmental jurisdictions are made up of general purpose governments (county, municipal and town or township) and special purpose governments (special districts and independent school districts).  *See also* tbl.2. CG1700ORG02 Table Notes_Local Governments by Type and State_2017.

[19] *See id.* at tbl.5.  County Governments by Population-Size Group and State: 2017 [CG1700ORG05], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 2,105 county governments with populations less than 50,000.  This category does not include subcounty (municipal and township) governments.

[20] *See id.* at tbl.6.  Subcounty General-Purpose Governments by Population-Size Group and State: 2017 [CG1700ORG06], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 18,729 municipal and 16,097 town and township governments with populations less than 50,000.

[21] *See id.* at tbl.10.  Elementary and Secondary School Systems by Enrollment-Size Group and State: 2017 [CG1700ORG10], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 12,040 independent school districts with enrollment populations less than 50,000.  *See also* tbl.4.  Special-Purpose Local Governments by State Census Years 1942 to 2017 [CG1700ORG04], CG1700ORG04 Table Notes_Special Purpose Local Governments by State_Census Years 1942 to 2017.

[22] While the special purpose governments category also includes local special district governments, the 2017 Census of Governments data does not provide data aggregated based on population size for the special purpose governments category.  Therefore, only data from independent school districts is included in the special purpose governments category.

[23] This total is derived from the sum of the number of general purpose governments (county, municipal and town or township) with populations of less than 50,000 (36,931) and the number of special purpose governments - independent school districts with enrollment populations of less than 50,000 (12,040), from the 2017 Census of Governments - Organizations tbls. 5, 6 & 10.

[24] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite)*," https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[25] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[26] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[27] *Id*.  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

as of December 31, 2021, there were 594 providers that reported they were engaged in the provision of wireless services.[28]  Of these providers, the Commission estimates that 511 providers have 1,500 or fewer employees.[29]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

### D.    Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities

9.    The *Further Notice* seeks comment on issues that may alter the Commission's current information collection, reporting, recordkeeping, or compliance requirements for small entities.  The Commission seeks comment on whether wireless providers have effectively obtained consent to make robocalls and send robotexts to their own subscribers by virtue of their unique relationship with their subscribers or if they must obtain such consent for robocalls and robotexts.  The Commission seeks comment on whether the right to revoke consent extends to wireless subscribers when they receive unwanted robocalls and robotexts from their wireless provider, just as it does to any robocalls or robotexts sent pursuant to the TCPA.[30]  In particular, whether wireless providers would be required to honor any revocation or opt-out requests from their own subscribers that are made through any reasonable means and at any time.  If adopted, this may require wireless providers to obtain consent from their own subscribers for robocalls and robotexts and may require such providers to maintain records on whether they have such consent and on any revocation of consent by their subscribers.  Additionally, such revocation may be from all robocalls and robotexts, or from certain ones (such as marketing) and the wireless providers would be required to maintain such records on the specific revocation requests.  We also seek comment on a request to require every call that uses an artificial or prerecorded voice to provide an automated opt-out mechanism.  There is not sufficient information in the record to quantify the cost of compliance for small entities, or to determine whether it will be necessary for small entities to hire professionals to comply with these proposals.  The Commission will review the record and further examine the economic impact of the proposals on small entities following the review of comments filed in response to the *Further Notice*.

### E.    Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered

10.    The RFA requires an agency to describe any significant alternatives that could minimize impacts to small entities that it has considered in reaching its approach, which may include the following four alternatives, among others: "(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for such small entities; (3) the use of performance, rather than design, standards; and (4) and exemption from coverage of the rule, or any part thereof, for such small entities." [31]

11.    In the *Further Notice* the Commission seeks comment on several alternatives that may impact small entities.  The Commission seeks comment on whether wireless providers have effectively obtained consent to make robocalls and send robotexts to their own subscribers by virtue of their unique relationship with their subscribers and whether this consent extends to telemarketing or other messages,

---

[28] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf.

[29] *Id.*

[30] *See 2015 TCPA Declaratory Ruling*, 30 FCC Rcd at 7993-99, paras. 55-70 (confirming that consumers who have provided consent to receive autodialed or prerecorded calls may revoke such consent through any reasonable means).

[31] 5 U.S.C. § 603(c)(1)–(4).

or if providers must obtain consent from their subscribers for such robocalls and robotexts. The Commission proposes that the right to revoke consent for robocalls and robotexts extends to wireless subscribers when they receive unwanted robocalls and robotexts from their own wireless provider, just as it does to any robocalls or robotexts sent to a consumer. The Commission proposes that wireless providers must honor any revocation or opt-out requests from their own subscribers that are made through any reasonable means and at any time. This proposal, if adopted, would apply to all wireless providers, including small entities.

12.      This proposal, if adopted, would apply to all wireless providers, including small wireless entities. The Commission expects that the obligation to honor revocation requests will not be unduly burdensome to small wireless providers and recognizes that some wireless providers already honor opt-out requests on many communications to subscribers. The Commission observes that other entities have implemented such measures to honor revocation requests for decades to comply with the Commission's rules. Nevertheless, the Commission seeks comment on ways to reduce any new burdens such requirements might create for smaller wireless providers. Lastly, the Commission seeks comment on any burdens imposed by requiring all artificial or prerecorded voice calls to provide an automated opt-out mechanism to stop such calls including any alternatives that would minimize the impact on small entities.

F.      **Federal Rules that May Duplicate, Overlap, or Conflict with the Proposed Rules**

13.      None.

## APPENDIX D

## List of Commenters

| Commenter | Abbreviation |
|---|---|
| ACA International et al. | ACA |
| Ad Hoc Telecom Users Committee | Ad Hoc |
| American Bankers Association et al. | ABA |
| AT&T Services, Inc. | AT&T |
| Benefits Data Trust | BDT |
| Cargo Airline Association | Cargo |
| CTIA | CTIA |
| Edison Electric Institute | EEI |
| GECU Federal Credit Union | GECU |
| Illinois Credit Union League | Illinois Credit |
| Mobile Ecosystem Forum | MEF |
| National Association of Mutual Insurance Companies | NAMIC |
| National Consumer Law Center et al. | NCLC* |
| NTCA – The Internet & Television Association | NTCA |
| National Lifeline Association | NLA |
| Professional Associations for Customer Engagement | PACE |
| Service Federal Credit Union | SFCU |
| Kelly Subbaiah | Subbaiah |
| UnitedHealth Group | UHG |
| Verizon | Verizon |
| Vibes Media, LLC | Vibes |
| Marjorie Williams | Williams |
| ZipDX LLC | ZipDX |

\* filing both comment and reply comment (bold - reply comments only)

**STATEMENT OF
CHAIRWOMAN JESSICA ROSENWORCEL**

Re:     *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG
        Docket No. 02-278, Report and Order and Further Notice of Proposed Rulemaking (February 15,
        2024)

Every week, we are looking for news way to quash junk robocalls and robotexts.  There is good reason for this. They are awful, they are annoying, and they are eroding trust in our communications networks.  Because the bad actors behind them won't stop, neither will we.  That is why today we update our rules under the Telephone Consumer Protection Act to make clear consumers have the right to choose what calls and texts they receive.  We do this because no consumer should be forced to jump through hoops or say special magic words to stop this junk from reaching them and those who send this nonsense need to honor your request.

Last week, we also took action to stop the newest form of unwanted communications—robocalls using Artificial Intelligence voice-cloning technology.  We made clear that restrictions on the use of "artificial or prerecorded voice" in the Telephone Consumer Protection Act apply to calls that use AI to simulate a human voice.  That means when these calls show up, State Attorneys General can go after those responsible and hold them accountable.  In fact, 26 State Attorneys General are already on record supporting this approach.

One of them, the State Attorney General of New Hampshire, worked with us over the last few weeks to take action to address fake voice cloned calls that were designed to confuse residents about when and where to vote during the primary election in the state.  He went after the entity responsible for these calls and we went after the provider carrying the suspected illegal robocall traffic.

In the not-too-distant future we could all be on the receiving end of these fake calls. The law we have to address this situation is not new, so kudos to Congressman Pallone for introducing the Do Not Disturb Act to update it, but I want to make clear that when we see problems we will act often and act fast because we need to get this junk off the line.

Thank you to the Robocall Response Team and staff responsible for this effort, including Aaron Garza, Wes Platt, Mika Savir, Richard Smith, Mark Stone, and Kristi Thornton from the Consumer and Governmental Affairs Bureau; Jessica Manuel and Daniel Stepanicich from the Enforcement Bureau; Richard Mallen and Malena Barzilai from the Office of General Counsel; Mark Montano from the Office of Economics and Analytics; and Joycelyn James from the Office of Communications Business Opportunities.

**Federal Communications Commission**                                                          **FCC 24-24**

STATEMENT OF
**COMMISSIONER ANNA M. GOMEZ**

Re:     *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG
        Docket No. 02-278, Report and Order and Further Notice of Proposed Rulemaking (February 15,
        2024)

In today's increasingly digital world, consumers are inundated with information coming through a variety of different communications channels.  Some of these communications provide helpful information about potential fraud, bank activity, health care appointments, and emergency alerts.  But, the majority of it is junk.  Junk robocalls and robotexts make it feel impossible to manage them and consumers end up ignoring these automated communications entirely, even the helpful ones.  Consider the difficulty of navigating these communications and removing yourself from unwanted lists if you speak a language other than English.

Today, we update our rules to strengthen consumers' rights to decide which robocalls and robotexts they receive.  We are making it easier for consumers to remove themselves from spam lists.  We clarify that consumers can opt-out of call or text lists using any reasonable means.  We explain that "reasonable means" of opting-out of automated texts include, but are not limited to: "stop," "quit," "end," "revoke," "opt out," "cancel," or "unsubscribe."  We clarify that consumers may respond in the language in which they received the communication.  If you get a message in Spanish, you can respond in Spanish to opt-out.  While we provide these as examples, our updates mean that there are no magic words that consumers must say.  This is important.

These updates strike the right balance of ensuring consumers have the ability to easily and effectively opt out of junk robocalls and robotexts, while remaining connected to the communications they find helpful.

I want to thank the Office of the Chairwoman and the Consumer and Governmental Affairs Bureau for working with my office to clarify that consumers can revoke consent by responding in the language they received the communication.

**DECLARACIÓN DE LA COMISIONADA**
**ANNA M. GOMEZ**

Re:     *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG
        Docket No. 02-278, Report and Order and Further Notice of Proposed Rulemaking (February 15,
        2024)

Hoy en día, en un mundo cada vez más digitalizado, los consumidores se ven inundados por la información que reciben a través de diversos canales de comunicación.  Algunas de estas comunicaciones son útiles, pero la gran mayoría son de escaso valor.  Se trata de lo que conocemos comúnmente como mensajes "chatarra."  Las llamadas automáticas y los mensajes de texto con contenido "chatarra" parecen imposibles de manejar, y los consumidores terminan ignorando por completo estas comunicaciones automatizadas, incluso aquellas que son de utilidad.  Ahora, imaginémonos lo difícil que resulta lidiar con estas comunicaciones y quitar nuestros nombres de listas de mercadeo en las que no queremos figurar, cuando hablamos un idioma distinto del inglés.

Hoy, estamos actualizando nuestras reglas para fortalecer el derecho de los consumidores a decidir qué llamadas y textos automatizados están dispuestos a recibir y cuáles no desean recibir. Estamos facilitando la forma en que los consumidores pueden eliminar sus nombres de las listas de mercadeo no deseado.  Estamos aclarando que los consumidores pueden utilizar cualquier medio razonable para optar por no figurar en determinadas listas de llamadas o de mensajería de textos. Clarificamos que los consumidores podrán responder en el idioma de la comunicación que recibieron. Por lo tanto, si usted recibe un mensaje en español, puede responder en español para que eliminen su nombre de la lista y no le vuelvan a enviar mensajes.  Asimismo, aclaramos que no hay ninguna palabra mágica que los consumidores necesiten usar.  Eso es importante.

Estas actualizaciones logran el equilibrio adecuado para garantizar que los consumidores tengan la capacidad de optar, de manera fácil y efectiva, por no recibir llamadas automáticas y mensajes de texto no deseados, y que a la vez permanezcan conectados para recibir las comunicaciones que consideran útiles.

Quiero agradecer a la oficina de la presidenta de la FCC (OCH) y a la oficina de asuntos gubernamentales y del consumidor (CGB), por el trabajo realizado en conjunto con mi oficina para clarificar que los consumidores pueden revocar su consentimiento respondiendo en el idioma de la comunicación que recibieron.